## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| XTRA LEASE LLC, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| JAMES J. PEARSON, | ) | Case No. |
| | ) | |
| **Serve At:** | ) | |
| | ) | |
| **4329 Biddleford Circle** | ) | |
| **Doylestown, PA 18902** | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

### VERIFIED COMPLAINT

Comes now Plaintiff XTRA Lease LLC ("XTRA") and for its Verified Complaint ("Complaint") against Defendant James J. Pearson ("Pearson") states as follows:

### INTRODUCTION

1.     Pearson is a former Area Manager and Branch Manager for XTRA.  This action arises largely out of Pearson's misappropriation of XTRA's confidential, competitively-valuable and trade secret information in connection with his recent resignation from XTRA on July 3, 2013, and his subsequent employment with XTRA's direct competitor, Premier Trailer Leasing, Inc. ("Premier").

2.     By mid-June 2013, and while Pearson was in active discussions with Premier's President and Vice President to join Premier, Pearson (a) improperly downloaded and copied onto an unapproved HP v125w USB portable electronic device (the "HP Device") and/or (b) improperly e-mailed to his personal e-mail address, confidential, competitively-valuable and trade secret information pertaining to XTRA's business.  Pearson's misconduct continued after

4145150

he received his June 28, 2013 offer letter from Premier, and further continued after he signed and dated Premier's offer letter on July 1, 2013. Pearson, however, did not tell XTRA he was resigning until July 3, 2013, and his improper copying and downloading of XTRA's confidential and competitively-valuable information onto the HP Device continued until July 3, 2013 – which was his last day of employment at XTRA.

3.      As Branch Manager for XTRA's Allentown, Pennsylvania office, Pearson had no legitimate reason to e-mail to his personal e-mail address or to download and transfer XTRA's confidential information onto the portable HP Device in connection with his departure or possible departure from XTRA and his plan to join Premier. On July 3, 2013, for example, Pearson improperly copied onto his HP Device detailed confidential and trade secret information pertaining to XTRA's business in Chicago, Louisville and Memphis, even though he was Branch Manager only for Allentown. In short, Pearson on information and belief was improperly accessing, downloading, copying onto the HP Device and/or e-mailing to his personal e-mail address significant confidential, competitively valuable and trade secret information of XTRA in order to help him and Premier.

4.      Pearson's misconduct (among other things) violates the Missouri Uniform Trade Secrets Act, Mo. Rev. Stat. §§ 417.450 *et. seq.* ("MUTSA"), the Pennsylvania Uniform Trade Secrets Act, 12 Pa. Cons. Stat. § 5301 *et. seq.* ("PUTSA"), the Missouri computer tampering statutes, Mo. Rev. Stat. §§ 537.525 and 569.095 *et. seq.* ("MCTS"), the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"), and Pearson's duty of loyalty to XTRA. Additionally, Pearson has breached a contract he has with XTRA by failing to reimburse XTRA for approximately $37,000 he owes to XTRA for relocation benefits he received during his employment with XTRA.

4145150

**PARTIES, JURISDICTION AND VENUE**

5.     Plaintiff XTRA is a Delaware limited liability company with its headquarters and principal place of business in St. Louis County, Missouri.  XTRA maintains its central databases and servers at its corporate offices located in St. Louis County, Missouri, and Pearson improperly accessed, took, copied and/or downloaded confidential and trade secret information from the servers and databases.

6.     Defendant Pearson is, on information and belief, an individual citizen of Pennsylvania who resides at 4329 Biddleford Circle, Doylestown, PA 18902.  Pearson is a former Branch Manager at XTRA and, upon information and belief, is currently employed by Premier, which is a direct competitor of XTRA, as a General Manager.

7.     The Court has subject matter jurisdiction under 28 U.S.C. § 1332(a), the CFAA under 18 U.S.C. § 1030, 28 U.S.C. § 1331, and pendent jurisdiction over XTRA's Missouri and Pennsylvania state law claims for Pearson's violations of the MUTSA, PUTSA, MCTS, his breach of his duty of loyalty, and his breach of contract.  The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

8.     This Court has personal jurisdiction over Pearson because Pearson's tortious activities of improperly accessing, downloading and/or taking of XTRA's confidential, competitively-valuable and trade secret information occurred in significant part in this judicial district.  Much of the confidential and trade secret information Pearson improperly accessed, downloaded, copied and/or took was accessed, downloaded, copied and/or taken from XTRA's servers and databases located in St. Louis, and the impact from Pearson's misconduct is being and will be felt directly in St. Louis.

9.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because the Court has personal jurisdiction over Pearson, a substantial part of the conduct giving rise to the claims herein occurred in this district, and substantial injury to XTRA occurred in this district.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

### XTRA and Premier are Direct Competitors

10.     XTRA is a leading provider of truck semi-trailers for rent and lease in the United States.   XTRA has approximately sixty locations nationwide and maintains a fleet of approximately 80,000 commercial trailers for rent and lease, including "dry van" style trailers, refrigerated trailers (known as "reefers" in the industry), flatbeds, local cartage vans, storage vans and specialty equipment.   XTRA also offers services in connection with its commercial trailer rental and leasing business, including emergency roadside assistance, pickup and delivery, tracking, and maintenance services.

11.     XTRA is headquartered in St. Louis, Missouri, where it maintains its online databases for its employees.   Additionally, its Information Technology Department is based in St. Louis, Missouri.

12.     XTRA's computer servers are also located in St. Louis, Missouri, including servers that Pearson improperly accessed in downloading and misappropriating XTRA's confidential, trade secret and other information so he could take it in order to, on information and belief, use it for and on behalf of Premier.

13.     Pearson's new employer, Premier, also rents and leases trailers and competes directly against XTRA.

14.     Premier on information and belief has been in business since 2005; has over twenty-two locations; maintains a fleet of approximately 20,000 trailers; and is primarily based in the Midwestern and Southeastern regions of the United States.

15.     On August 13, 2011, Premier filed a petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101, et. seq.  On May 23, 2012, the plan of reorganization became effective, and Premier emerged from the Chapter 11 proceedings.

16.     According to Premier's website, it is seeking to expand its business throughout the continental United States.

17.     Premier's President is James Aubuchon ("Aubuchon").  Aubuchon previously worked for XTRA until he was terminated on or about April 19, 2010.  Since his termination and subsequent employment with Premier, Aubuchon and Premier appear to be targeting XTRA's employees for employment with Premier.

### Pearson's Employment with XTRA Provided Him Substantial Confidential and Trade Secret Information Pertaining to XTRA's Business

18.     On or about May 6, 2009, XTRA hired Pearson as one of its Area Managers for Region 6, which had a region office in Pennsylvania, and which included six branch offices in Pennsylvania, two in New Jersey, two in Massachusetts, and one each in Maryland and New York.  As an Area Manager, Pearson was responsible for (among other things) overseeing sales activity within Region 6, developing and training sales people who reported to him, and increasing sales with key accounts.

19.     During his employment at XTRA, Pearson attended several training sessions at XTRA's corporate offices in St. Louis, Missouri.

20.     While Pearson was an XTRA Area Manager, he had a working relationship with Brendan Perry ("Perry"), a former Branch Manager of XTRA's New England Branch, who like

5

Pearson recently resigned to work for Premier. Perry resigned from XTRA on July 1, 2013, to join Premier. As described in more detail below, Pearson received an offer letter from Premier dated June 28, 2013; he appears to have signed it on July 1, 2013; but he did not tell XTRA he was resigning until July 3, 2013.

21.     In January 2012, in connection with a regional consolidation by XTRA, Pearson became the Branch Manager for XTRA's branch located in Allentown, Pennsylvania (the "Allentown Branch").

22.     Since Pearson's new position as Branch Manager required that he move from Delaware to Pennsylvania, XTRA promised to compensate Pearson for his relocation expenses, which included (among other things) moving costs, temporary living expenses, miscellaneous moving allowances and home sale benefits.

23.     Pearson accepted the terms of XTRA's promise to pay his relocation costs by signing his Branch Manager Offer Letter in January 2012 (the "Relocation Agreement"). A copy of the Relocation Agreement is attached hereto as Exhibit A and its terms incorporated herein.

24.     According to the Relocation Agreement, Pearson agreed to reimburse XTRA 100% of his relocation costs if he left the company voluntarily within one year of his relocation, and 50% of the costs if he left within two years:

> "By accepting this offer you are agreeing to help XTRA Lease manage and minimize the cost of your relocation. Furthermore, by executing this agreement, you will agree to reimburse the Company 100 percent of the relocation costs if you leave the Company on your own volition within 365 days after the relocation is complete. If you leave the Company on your own volition within 730 days after the relocation is compete, you agree to reimburse the Company 50 percent of the relocation costs."

25.     XTRA paid in excess of $74,000 for Pearson's relocation costs pursuant to the Relocation Agreement.

4145150

26.     As an XTRA Branch Manager, Pearson was responsible for the general management and profit and loss of the Allentown Branch. His job responsibilities included developing customer accounts, assisting branch sales staff in the management, growth and development of their accounts, and supervising the overall job performance and development of staff at the Allentown Branch.

27.     Pearson's managerial responsibilities for XTRA provided him with access to confidential, competitively-valuable and trade secret information pertaining to XTRA's business performance, growth and development throughout the country, including access to XTRA's online databases through "XTRALink," which permits users to view key business intelligence reports, branch performance dashboards, customer dashboards, and other confidential information. XTRALink is accessible only through XTRA's corporate computer servers, which are located in St. Louis, Missouri.

28.     During his employment with XTRA, Pearson's access to XTRALink and XTRA's servers and databases allowed him to view highly confidential, competitively-valuable and trade secret information pertaining to XTRA's business, including among other things: (a) branch summary reports, which provide detailed breakdowns of the top customers, business opportunities, historical data, and overall financial status of each branch; (b) branch historic pickup reports, which contain historic data regarding how many trailers XTRA's customers picked up on a monthly basis throughout the year in a designated branch location; (c) expiring lease reports, which contained information regarding when the trailer leases for XTRA's customers would expire (allowing XTRA the opportunity to contact these customers at the most appropriate time about renewing their lease agreements); (d) reports summarizing branch rental lease conversion opportunities, which identify key potential conversion opportunities within

7

designated branches; and (e) branch top revenue accounts reports, which contain breakdowns of XTRA's most active customers for a particular location and how many trailers they rented and/or leased in each month.

29.     During his employment with XTRA, Pearson was also provided or had access to confidential, competitively-valuable and trade secret XTRA information pertaining to, among other things: (a) detailed branch manager and branch performance reports and rankings; (b) profit and loss data; and (c) detailed summaries regarding the historic profit and expense data for various branches.

30.     XTRA takes reasonable measures to protect its confidential information. For example, XTRA stores information on secure computer systems; limits the number of individuals who have access to the computer systems where the information is stored; requires unique user ids and passwords; and limits the rights of certain users to view or edit data.   In addition, XTRA's corporate headquarters and branch locations are secured by locked doors, and confidential information is stored in secured offices that are not generally accessible.   XTRA also has company policies that restrict the accessibility, use and disclosure of confidential information.

31.     XTRALink and XTRA's servers and databases, for example, are limited and are controlled by unique user ids and passwords.

32.     XTRA's policies include a document entitled "XTRA Lease Business Conduct Policy" (the "Business Conduct Policy"), which employees were required to read and sign.

33.     Under the Business Conduct Policy, employees were told:

> Employees should not have outside employment or business interests that place them in the position of (i) appearing to represent XTRA, (ii) providing goods or services substantially similar to those XTRA provides or is considering making available, (iii) providing goods or services to XTRA, or (iv) lessening the

4145150

> efficiency, productivity, or dedication to XTRA in performing their everyday duties. As a consequence, no employee should be employed by, act as a consultant to, or have a business relationship with, any competitor, supplier, vendor, or customer of XTRA. **In addition, employees may not divulge or use XTRA's confidential information—such as trade secrets, financial data, customer or employee information, and computer programs—for their own personal or business purposes.**

(Emphasis added).

34.    The Business Conduct Policy also provides the following with respect to computers and information stored on XTRA's system:

> All employees who work with the Company's computer-based resources are responsible for their appropriate use and protection from theft, damage, or loss. **Information created, transmitted, or accessed on Company networks is Company property** and the Company reserves the right to monitor or restrict access to it.

(Emphasis added).

35.    Pearson signed and agreed to abide by the Business Conduct Policy on January 10, 2013.

36.    XTRA's Employee Handbook also deals with the protection of XTRA's confidential information. It provides in part as follows:

### Non-Disclosure of Confidential Information

> During the course of employment, you may have access to confidential and proprietary information and trade secrets regarding the Company ("Confidential Information"). Such Confidential Information could include but is not limited to:
>
> - Information about client development and service strategies;
> - Client, supplier and vendor lists;
> - Preferences and characteristics;
> - Pricing strategies;
> - Strategic and business plans;
> - Sales and marketing plans;
> - Operating policies and manuals;
> - Financial information;
> - Legal matters;
> - Personnel information;

9

- Company's business philosophy and its methods and means of doing business.

You must hold in confidence and not directly or indirectly disclose, make public, use, or make copies of any such Confidential Information, except as may be expressly authorized by the Company. You are also required to take all reasonable steps necessary to ensure that such Confidential Information will not become known to third parties, including other employees who do not need to know such information.

Records, files, documents, computer disks and other materials, or copies thereof, containing such Confidential Information shall be and remain the sole property of the Company. These items shall not be removed from the Company's premises or otherwise used except for bona fide business purposes and shall be promptly returned to the Company upon request at any time during employment and immediately upon termination of employment with the Company.

37.     As a subsidiary of Berkshire Hathaway Inc., XTRA also required its employees to abide by the Berkshire Hathaway Inc. Code of Business Conduct and Ethics ("Code of Conduct"). The Code of Conduct, which defines "Covered Parties" to include subsidiary employees such as XTRA's directors, officers and employees, provides in part as follows:

> 5.     *Confidentiality*
>
> Covered Parties must maintain the confidentiality of confidential information entrusted to them, except when disclosure is authorized by an appropriate legal officer of the Company or required by laws or regulations. Confidential information includes all non-public information that might be of use to competitors or harmful to the Company or its customers if disclosed. It also includes information that suppliers and customers have entrusted to the Company. The obligation to preserve confidential information continues even after employment ends.

38.     XTRA also has an information technology policy, which restricts the hardware that employees may attach to XTRA's computers:

**Hardware, Software & Data**

Each employee is responsible for taking reasonable measures to safeguard IT hardware, software and data. Follow all back-up or security procedures as instructed by your supervisor or by IT. You may not purchase or attach additional hardware or software without written permission from the IT Department . . . .

10

4145150

39.     As an employee of XTRA, Pearson was expected to abide by the terms of XTRA's policies, including but not limited to those reflected in the Business Conduct Policy, the Employee Handbook, the Code of Conduct and the information technology policy.

**Pearson's Improper Accessing, Downloading, Copying, Transferring and E-mailing of XTRA's Confidential, Competitively-Valuable and Trade Secret Information**

40.     On or about July 3, 2013, Pearson provided notice of his resignation to XTRA. In his resignation letter, Pearson, "in the interest of full disclosure," informed XTRA that he was leaving to join Premier. What Pearson did not disclose, however, was that he had been improperly stockpiling XTRA's confidential, competitively-valuable and trade secret information in order to, on information and belief, help him and Premier.

41.     After XTRA learned that Pearson intended to join Premier, XTRA promptly terminated his access rights to XTRA's computer network and e-mail system. Pearson's last day at XTRA was July 3, 2013.

42.     XTRA subsequently reviewed information in its computer system to determine whether Pearson engaged in improper conduct prior to resigning.

43.     XTRA also had a forensic copy of Pearson's company laptop made in an attempt to uncover his misconduct.

44.     XTRA's review of Pearson's e-mail communications and information from the forensic analysis of Pearson's company laptop revealed significant and disturbing information regarding Pearson's pre-departure activities. Among other things, it revealed that while Pearson was actively seeking employment with Premier, he also had been improperly downloading and copying XTRA's confidential, competitively-valuable and trade secret information from XTRA's computer network onto his HP Device, and also e-mailing such information to his

11

personal e-mail address. His improper conduct continued through July 3, 2013 – the day he resigned.

45.     In short, XTRA discovered that Pearson had been improperly accessing, downloading, copying onto an unapproved HP Device, and e-mailing to his personal e-mail address, substantial confidential, competitively-valuable and trade secret information of XTRA (a) after it was clear that Pearson wanted to join Premier, (b) after Premier had made Pearson an offer, and (c) even after Pearson had accepted Premier's offer, but before Pearson told XTRA he was resigning.

46.     Pearson's interest in employment with Premier dates back to at least March 2013. In March 2013, Pearson began communicating with Tim Ifland ("Ifland"), a former XTRA employee and current employee of Premier, regarding possible employment opportunities with Premier.

47.     Ifland resigned from XTRA on February 25, 2013, and joined Premier, where he is, on information and belief, a Vice President and General Manager.

48.     On March 4, 2013, Ifland sent Pearson a LinkedIn message stating that it was pleasure working with him. On March 5, 2013, Pearson and Ifland corresponded via e-mail, agreeing to stay in touch with one another.

49.     On March 21, 2013, Pearson e-mailed Ifland about meeting with him in a "neutral" location at a restaurant. Pearson also requested that Ifland call him about something he wanted to discuss with Ifland before their meeting the following week.

50.     Later that day, Pearson e-mailed Ifland information pertaining to his XTRA Relocation Agreement and his 2012 leasing facility expenses for 2012. Pearson told Ifland in the e-mail: "Here is the repayment portion of the Relocation Agreement that I was referring to and

4145150

the total cost based off my P&L . . . . " On information and belief, Pearson sent this information to Ifland in order to determine whether Premier would reimburse him for his repayment obligations to XTRA under the Relocation Agreement if Pearson left XTRA.

51.     On May 23, 2013, Pearson sent an e-mail to Aubuchon, Premier's President, regarding times Pearson would be available to meet with Brent Russell ("Russell"), Premier's Executive Vice President. Pearson stated in his May 23 e-mail to Aubuchon that he "look[ed] forward to meeting with Brent and discussing the position in greater detail." On information and belief, Aubuchon and Pearson were referring to Pearson's potential employment with Premier.

52.     On May 28, 2013, Aubuchon contacted Russell to "get something set up" with Pearson, apparently referring to a potential meeting between Russell and Pearson.

53.     On Wednesday, June 5, 2013, Pearson on information and belief used his XTRA company laptop to search several job search-related websites, including salary.com, job-search-engine.com and glassdoor.com, regarding XTRA and Premier.

54.     On Thursday, June 6, 2013, Pearson on information and belief met with Premier's Russell to discuss a job opportunity with Premier.

55.     On Friday, June 7, 2013, Pearson e-mailed Russell to thank him for meeting with him the prior night. Later on June 7, 2013, Aubuchon e-mailed Pearson, stating that he was impressed with Pearson and "will try to get something done after July 1st." On information and belief, Aubuchon was referring to Pearson's employment with Premier.

56.     On Monday, June 10, 2013, Pearson sent an e-mail containing "Fleetseek" lists from April 2013 to his personal e-mail address at "jimpear1740@gmail.com" (Pearson's "Personal E-mail Address"). Fleetseek is a third-party vendor that maintains a database of contact information and market data. XTRA pays approximately $6,000 annually subscribe to

13

Fleetseek, and it maintains its membership with Fleetseek for the benefit of XTRA. The Fleetseek List Pearson e-mailed to himself is competitively valuable, and XTRA knows of no legitimate reason for Pearson to e-mail this information to his Personal E-Mail Address on June 10, 2013.

57.    On Friday morning, June 14, 2013, at approximately 7:25 a.m., Pearson sent an e-mail to his Personal E-mail Address containing XTRA's New Trailer Parts Identification Presentation, Financial Impact Drivers Spreadsheet and Major Account Review methodology materials. The information Pearson e-mailed to himself was from approximately May 2009, and XTRA knows of no legitimate reason for Pearson to e-mail this information to his Personal E-Mail Address on June 14, 2013. Some of the information, though dated, was still confidential and competitively-valuable. Other of the information could, on information and belief, be helpful to and unjustly enrich a newer, less-established competitor such as Premier.

58.    Also on Friday morning, June 14, 2013, at approximately 7:26 a.m., Pearson sent himself another e-mail, to his Personal E-mail Address, attaching detailed, confidential financial information from 2009 for approximately seventeen XTRA branches or locations then located in Region 5 (i.e. Milwaukee and Green Bay, Wisconsin; Columbus, Cincinnati, Cleveland and Macedonia, Ohio; Detroit, Grand Rapids and Flint, Michigan; St. Paul, Minnesota; Louisville, Kentucky; Cedar Rapids, Iowa; Indianapolis, Indiana; St. Louis, Missouri; and at Chicago-O'Hare, Chicago-Midway, and in Joliet, Illinois). The financial information attached to Pearson's June 14, 2013 e-mail to himself included a detailed financial breakdown of the specific sales performance for each of these XTRA branches, which included branches located in areas of the country where, at present, Premier has no or less of a competitive presence. XTRA knows

14

of no legitimate reason for Pearson to e-mail this information to his Personal E-Mail Address on June 14, 2013. The information, though dated, was still confidential and competitively-valuable.

59.     Also on Friday morning, June 14, 2013, at approximately 7:53 a.m., Pearson sent an e-mail to his Personal E-Mail Address containing: (a) XTRA's Region 6 major accounts review calendar, which contained a competitively-valuable list of important Region 6 customers and their detailed account information; and (b) an internal document that outlined XTRA's major account management and review processes, sales strategy, and quarterly review process. Pearson originally received this information through an e-mail he received at his company e-mail address on May 20, 2009; Pearson forwarded this e-mail to his Personal E-Mail Address on June 14, 2013.    XTRA knows of no legitimate reason for Pearson to e-mail this information to his Personal E-Mail Address on June 14, 2013.  Some of the information, though dated, was still confidential and competitively-valuable, and could, on information and belief, be helpful to and unjustly enrich a newer, less-established competitor such as Premier.

60.     Also on Friday morning, June 14, 2013, between 8:36 a.m. and 9:28 a.m., Pearson accessed and downloaded XTRA's information onto his HP Device.   The information he downloaded and copied included confidential and competitively-valuable information of XTRA, as well as other information which could, on information and belief, be helpful to and unjustly enrich a newer, less-established competitor such as Premier.   For example, Pearson on information and belief copied onto his HP Device information pertaining to XTRA's value proposition demonstrations.

61.     On Saturday, June 15, 2013, Pearson completed background screening and drug testing authorization forms relating to his possible employment with Premier.

15

62.     Also on or about Saturday, June 15, 2013, Pearson signed and dated a document authorizing Premier and its agents to conduct a background check on him as part of Premier's hiring process.

63.     On Wednesday, June 19, 2013, Pearson completed a Request for Driver Information for the State of Pennsylvania.  On information and belief, Pearson completed the form as part of the application process for Premier.

64.     On Friday, June 21, 2013, at approximately 4:43 a.m., Pearson sent an e-mail to his Personal E-mail Address attaching XTRA's "Sales Scorecard" data from January through May 2013.  The Sales Scorecard data that Pearson e-mailed to himself contained detailed, confidential and competitively-valuable sales revenue and job performance information of XTRA, including that relating to the regional rank, fleet average data, sales revenue and operating lease revenue for XTRA's branch managers and branches located in Birmingham, Alabama; Richmond, Virginia; Orlando, Florida; Chattanooga, Tennessee; Allentown, Pennsylvania; Duncan, South Carolina; Atlanta, Georgia; Carlisle, Pennsylvania; Nashville, Tennessee; Albany, New York; Jacksonville, Florida; Charlotte and Greensboro, North Carolina; Baltimore, Maryland; Newark, New Jersey; New England (located in Massachusetts); and Scranton, Pennsylvania.  XTRA knows of no legitimate reason for Pearson to e-mail this information to his Personal E-Mail Address on June 21, 2013.

65.     Also on Friday, June 21, 2013, at approximately 4:43 a.m., Pearson sent himself an e-mail to his Personal E-mail Address attaching XTRA's Region 7 consolidating full profit and loss statements for 2013.  The information he sent to himself contains highly confidential and competitively-valuable information.  The profit and loss statements contained detailed, line-by-line monthly summaries of the Region 7's financial figures, including but not limited to: (a)

16

the base rates and specifications for XTRA's products; (b) fleet specifications, net investment and utilization figures; (c) licensing, property-related taxes, equipment sales, finance income and depreciation calculations for the branch; (d) branch expenses; (e) maintenance, tires, transport and repositioning expense performance; (f) revenue and rebill credits; and (g) branch revenue, utilization and financial performance. XTRA knows of no legitimate reason for Pearson to e-mail this information to his Personal E-Mail Address on June 21, 2013.

66.     On Wednesday, June 26, 2013, Pearson received confirmation of Premier's receipt of his application for a General Manager position at Premier.

67.     On or shortly after Friday, June 28, 2013, Pearson received an offer letter from Premier, dated June 28, 2013, for a General Manager position. The start date in Premier's offer letter was July 15, 2013.

68.     According to Premier's June 28 offer letter, Pearson (among other things) would be eligible to receive bonus compensation tied to Premier's earnings. As a result, Pearson has incentive to maximize Premier's financial success, which in turn incentivizes him to use the information he misappropriated from XTRA.

69.     On Saturday, June 29, 2013, at 6:25 a.m., Pearson sent an e-mail to his Personal E-Mail Address attaching comprehensive financial overview materials related to XTRA's business. Pearson's Saturday morning e-mail to himself contained, among other things, detailed profitability breakdowns for XTRA's products, sales figures, income information, depreciation costs, facility expenses, revenue and rebill credit information and the utilization and base performance figures over a twelve-month period. This information is extremely confidential and competitively-valuable, and XTRA knows of no legitimate reason for Pearson to e-mail this

17

information to his Personal E-Mail Address on Saturday, June 29, 2013, much less any legitimate reason for doing so when he was on the verge of leaving XTRA to join Premier.

70.     On Sunday evening, June 30, 2013, shortly after 8:00 p.m., Pearson apparently created and/or placed a folder called "Accounts – Info" on his HP Device.   Approximately fifteen minutes later, Pearson was accessing, from his XTRA company laptop, the following computer files:

- Region 1 Active Ops.xlsx
- Region 3 Active Ops.xlsx
- Region 5 Active Ops.xlsx
- Region 1 Contacts.xlsx
- Region 3 Contacts.xlsx
- Region 5 Contacts.xlsx
- Region 7 Contacts.xlsx

XTRA knows of no reason for Pearson to search for and access this information on his company laptop on Sunday evening, June 30, 2013, much less any legitimate reason for doing so when he was on the verge of leaving XTRA to join Premier.

71.     On information and belief, the above-listed computer files contained spreadsheets/compilations with highly confidential and very competitively-valuable information pertaining to XTRA's customers located throughout the country (XTRA's business is divided into Regions 1, 3, 5 and 7) and XTRA's active opportunities in three of XTRA's four regions.

72.     These computer files appear to have been in a folder also named "Accounts – Info" that was on Pearson's company laptop, but neither the files listed above nor the Accounts – Info folder can now be found on Pearson's company laptop.

73.     Because of (among other things) (a) the proximity in times, (b) the similarity in names (i.e., the "Account – Info" folder name), (c) an Account – Info folder being placed and/or created on Pearson's HP Device as of Sunday evening, June 30, 2013, (d) Pearson's offer letter

4145150

from Premier being dated June 28, 2013, (e) Pearson dating (and presumably signing) his offer letter on July 1, 2013, (f) Pearson working on his resignation letter on July 1, and (g) Pearson's other improper downloading and copying described above, XTRA believes that Pearson may have copied XTRA's regional contacts and regional active opportunities information onto his HP Device along with the other confidential and trade secret information he improperly copied and took.

74.     Pearson's accessing of this information is suspicious, especially since he knew he was on the verge of resigning the next day.

75.     On Monday, July 1, 2013, Pearson signed and dated Premier's offer letter, accepting the position of General Manager at Premier.

76.     Also on Monday, July 1, 2013, between approximately 12:31 p.m. and 2:57 p.m., Pearson accessed, copied and downloaded onto his HP Device XTRA documents, files and/or information, including that which, to XTRA's knowledge, Pearson had no legitimate reason to be downloading and copying at that point. For example, Pearson appears to have accessed, downloaded and copied onto his HP Device a copy of XTRA's Employee Handbook (which is not confidential but which could help a competitor), XTRA's monthly utilization report for the Allentown Branch, and a document referred to as the "360 review results". Pearson's copying of this information onto his HP Device is suspicious, especially since he knew he was resigning in order to join Premier.

77.     On Monday, July 1, 2013, Pearson on information and belief prepared a resignation letter to XTRA. He did not provide it to XTRA, however, until July 3, 2013.

78.     On Tuesday, July 2, 2013 — the day **after** he signed his offer letter with Premier on July 1, but **before** he told XTRA he was resigning — Pearson appears to have kicked his

19

misconduct into high gear.  At approximately 7:05 a.m. on July 2, Pearson sent an e-mail to his Personal E-Mail Address, attaching a compilation of XTRA's Daily and Year-to-Date Utilization Reports.  The Utilization Reports contained the current fleet size and also per diem and long term lease working unit information from January 1 through July 1, 2013, as well the detailed information for all branches located in Region 7.  This information is highly confidential and competitively valuable, and XTRA knows of no legitimate reason for Pearson to e-mail all of this information to his Personal E-Mail Address, especially since he had already accepted Premier's offer and was on the verge of resigning from XTRA the next day.

79.    Also Tuesday, July 2, 2013, between 6:44 a.m. and 11:41 a.m., Pearson accessed and viewed confidential, competitively valuable information via XTRALink and XTRA's databases and servers, which are located and maintained in St. Louis, Missouri.  The information Pearson accessed contained highly confidential, competitively-valuable and trade secret information which, to XTRA's knowledge, Pearson had no legitimate reason to be accessing and viewing at that point.

80.    For example, Pearson accessed and viewed confidential, competitively-valuable information pertaining to approximately eighteen other XTRA branch locations, including those located in: Newark, New Jersey; Richmond, Virginia; Charlotte and Greensboro, North Carolina; Duncan, South Carolina; Atlanta, Georgia; Baltimore, Maryland; Birmingham, Alabama; Orlando and Jacksonville, Florida; Carlisle, Scranton, and Pittsburgh, Pennsylvania; Chattanooga, Tennessee; Cincinnati, Cleveland and Columbus, Ohio; and Detroit, Michigan.  A partial listing of the information Pearson accessed on his XTRA company laptop from XTRA's online database on Tuesday morning, July 2, 2013, is provided below:

4145150

| URL Name | Visit Count | Last Accessed |
|---|---|---|
| E:/Top Accounts by Branch/Branch Top Revenue Customers - Allentown.xls | 1 | 7/2/2013 6:44 |
| E:/Branch Rental Lease Conversion Opportunity/Branch Rental Lease Conversion Opportunity - Newark.xls | 1 | 7/2/2013 6:46 |
| E:/Top Accounts by Branch/Branch Top Revenue Customers - Newark.xls | 1 | 7/2/2013 6:47 |
| E:/Branch Top Revenue Accounts/Branch Top Revenue Customers - Carlisle.xls | 1 | 7/2/2013 6:54 |
| http://xtralink.xtra.com/BICenter/Dashboards/Branch/Sales Action Items.aspx | 3 | 7/2/2013 6:54 |
| E:/Branch Historic Pickups/Branch Historic Pickups - Carlisle.xls | 1 | 7/2/2013 6:55 |
| E:/Branch Expiring Leases - 90 Days/Branch Expiring Leases - Carlisle.xls | 1 | 7/2/2013 6:56 |
| E:/Branch Rental Lease Conversion Opportunity/Branch Rental Lease Conversion Opportunity - Richmond.xls | 1 | 7/2/2013 6:59 |
| E:/Branch Rental Lease Conversion Opportunity/Branch Rental Lease Conversion Opportunity - Charlotte.xls | 1 | 7/2/2013 7:01 |
| E:/Branch Top Revenue Accounts/Branch Top Revenue Customers - Charlotte.xls | 1 | 7/2/2013 7:02 |
| http://xtralink.xtra.com/BICenter/Dashboards/Branch/Sales Action Items.aspx | 4 | 7/2/2013 7:02 |
| E:/Branch Historic Pickups/Branch Historic Pickups - Charlotte.xls | 1 | 7/2/2013 7:03 |
| E:/Branch Expiring Leases - 90 Days/Branch Expiring Leases - Charlotte.xls | 1 | 7/2/2013 7:04 |
| E:/Branch Historic Pickups/Branch Historic Pickups - Duncan.xls | 1 | 7/2/2013 7:06 |
| http://xtralink.xtra.com/BICenter/Dashboards/Branch/Branch Summary.aspx | 5 | 7/2/2013 7:06 |
| E:/Branch Rental Lease Conversion Opportunity/Branch Rental Lease Conversion Opportunity - Duncan.xls | 1 | 7/2/2013 7:07 |
| E:/Branch Top Revenue Accounts/Branch Top Revenue Customers - Duncan.xls | 1 | 7/2/2013 7:07 |
| E:/Branch Rental Lease Conversion Opportunity/Branch Rental Lease Conversion Opportunity - Greensboro.xls | 1 | 7/2/2013 7:31 |
| E:/Branch Historic Pickups/Branch Historic Pickups - Greensboro.xls | 1 | 7/2/2013 7:33 |
| E:/Branch Expiring Leases - 90 Days/Branch Expiring Leases - Greensboro.xls | 1 | 7/2/2013 7:34 |
| E:/Branch Historic Pickups/Branch Historic Pickups - Atlanta North.xls | 1 | 7/2/2013 7:38 |
| E:/Branch Top Revenue Accounts/Branch Top Revenue Customers - Atlanta North.xls | 1 | 7/2/2013 7:39 |

4145150

| | | |
|---|---|---|
| E:/Branch Rental Lease Conversion Opportunity/Branch Rental Lease Conversion Opportunity - Atlanta South.xls | 1 | 7/2/2013 7:40 |
| E:/Branch Top Revenue Accounts/Branch Top Revenue Customers - Atlanta South.xls | 1 | 7/2/2013 7:41 |
| E:/Branch Historic Pickups/Branch Historic Pickups - Atlanta South.xls | 1 | 7/2/2013 7:42 |
| E:/Branch Expiring Leases - 90 Days/Branch Expiring Leases - Atlanta South.xls | 1 | 7/2/2013 7:43 |
| E:/Branch Historic Pickups/Branch Historic Pickups - Baltimore.xls | 1 | 7/2/2013 7:44 |
| E:/Branch Rental Lease Conversion Opportunity/Branch Rental Lease Conversion Opportunity - Baltimore.xls | 1 | 7/2/2013 7:45 |
| E:/Branch Top Revenue Accounts/Branch Top Revenue Customers - Baltimore.xls | 1 | 7/2/2013 7:46 |
| E:/Branch Rental Lease Conversion Opportunity/Branch Rental Lease Conversion Opportunity - Birmingham.xls | 1 | 7/2/2013 7:47 |
| E:/Branch Top Revenue Accounts/Branch Top Revenue Customers - Birmingham.xls | 1 | 7/2/2013 7:48 |
| E:/Branch Historic Pickups/Branch Historic Pickups - Birmingham.xls | 1 | 7/2/2013 7:48 |
| E:/Branch Expiring Leases - 90 Days/Branch Expiring Leases - Birmingham.xls | 1 | 7/2/2013 7:49 |
| E:/Branch Historic Pickups/Branch Historic Pickups - Orlando.xls | 1 | 7/2/2013 8:12 |
| E:/Branch Expiring Leases - 90 Days/Branch Expiring Leases - Orlando.xls | 1 | 7/2/2013 8:13 |
| E:/Branch Rental Lease Conversion Opportunity/Branch Rental Lease Conversion Opportunity - Jacksonville.xls | 1 | 7/2/2013 8:21 |
| E:/Branch Top Revenue Accounts/Branch Top Revenue Customers - Jacksonville.xls | 1 | 7/2/2013 8:21 |
| E:/Branch Historic Pickups/Branch Historic Pickups - Jacksonville.xls | 1 | 7/2/2013 8:22 |
| E:/Branch Expiring Leases - 90 Days/Branch Expiring Leases - Jacksonville.xls | 1 | 7/2/2013 8:23 |
| E:/Branch Historic Pickups/Branch Historic Pickups - Scranton.xls | 1 | 7/2/2013 8:25 |
| E:/Branch Expiring Leases - 90 Days/Branch Expiring Leases - Scranton.xls | 1 | 7/2/2013 8:26 |
| E:/Branch Rental Lease Conversion Opportunity/Branch Rental Lease Conversion Opportunity - Scranton.xls | 1 | 7/2/2013 8:26 |
| E:/Branch Top Revenue Accounts/Branch Top Revenue Customers - Scranton.xls | 1 | 7/2/2013 8:27 |
| E:/Branch Rental Lease Conversion Opportunity/Branch Rental Lease Conversion Opportunity - Chattanooga.xls | 1 | 7/2/2013 8:29 |
| E:/Branch Top Revenue Accounts/Branch Top Revenue Customers - Chattanooga.xls | 1 | 7/2/2013 8:34 |

4145150

| | | |
|---|---|---|
| E:/Branch Rental Lease Conversion Opportunity/Branch Rental Lease Conversion Opportunity - Cincinatti.xls | 1 | 7/2/2013 8:46 |
| E:/Branch Top Revenue Accounts/Branch Top Revenue Customers - Cincinnati.xls | 1 | 7/2/2013 8:48 |
| E:/Branch Historic Pickups/Branch Historic Pickups - Cincinnati.xls | 1 | 7/2/2013 8:50 |
| E:/Branch Expiring Leases - 90 Days/Branch Expiring Leases - Cincinnati.xls | 1 | 7/2/2013 8:51 |
| E:/Branch Historic Pickups/Branch Historic Pickups - Cleveland.xls | 1 | 7/2/2013 8:53 |
| E:/Branch Expiring Leases - 90 Days/Branch Expiring Leases - Cleveland.xls | 1 | 7/2/2013 8:53 |
| http://xtralink.xtra.com/BICenter/Dashboards/Branch/Branch Summary.aspx | 10 | 7/2/2013 8:53 |
| E:/Branch Rental Lease Conversion Opportunity/Branch Rental Lease Conversion Opportunity - Cleveland.xls | 1 | 7/2/2013 8:55 |
| E:/Branch Top Revenue Accounts/Branch Top Revenue Customers - Cleveland.xls | 1 | 7/2/2013 8:55 |
| E:/Branch Rental Lease Conversion Opportunity/Branch Rental Lease Conversion Opportunity - Columbus.xls | 1 | 7/2/2013 8:58 |
| E:/Branch Top Revenue Accounts/Branch Top Revenue Customers - Columbus.xls | 1 | 7/2/2013 8:59 |
| http://xtralink.xtra.com/BICenter/Dashboards/Branch/Sales Action Items.aspx | 11 | 7/2/2013 8:59 |
| E:/Branch Historic Pickups/Branch Historic Pickups - Columbus.xls | 1 | 7/2/2013 9:00 |
| E:/Branch Expiring Leases - 90 Days/Branch Expiring Leases - Columbus.xls | 1 | 7/2/2013 9:00 |
| E:/Copy of Region 6 Expiring Leases.xls | 1 | 7/2/2013 9:12 |
| E:/Branch Expiring Leases - 90 Days/Branch Expiring Leases - Detroit.xls | 1 | 7/2/2013 11:31 |
| E:/Branch Historic Pickups/Branch Historic Pickups - Detroit.xls | 1 | 7/2/2013 11:32 |
| http://xtralink.xtra.com/BICenter/Dashboards/Branch/Branch Summary.aspx | 11 | 7/2/2013 11:32 |
| E:/Branch Rental Lease Conversion Opportunity/Branch Rental Lease Conversion Opportunity - Detroit.xls | 1 | 7/2/2013 11:33 |
| E:/Branch Top Revenue Accounts/Branch Top Revenue Customers - Detroit.xls | 1 | 7/2/2013 11:35 |
| E:/Branch Rental Lease Conversion Opportunity/Branch Rental Lease Conversion Opportunity -Pittsburgh.xls | 1 | 7/2/2013 11:36 |
| E:/Branch Top Revenue Accounts/Branch Top Revenue Customers - Pittsburgh.xls | 1 | 7/2/2013 11:37 |
| http://xtralink.xtra.com/BICenter/Dashboards/Branch/Sales Action Items.aspx | 12 | 7/2/2013 11:37 |

| | | |
|---|---|---|
| E:/Branch Historic Pickups/Branch Historic Pickups - Pittsburgh.xls | 1 | 7/2/2013 11:38 |
| E:/Branch Expiring Leases - 90 Days/Branch Expiring Leases - Pittsburgh.xls | 1 | 7/2/2013 11:39 |
| http://xtralink.xtra.com/BranchReports/Pages/RCBranchHome.aspx | 1 | 7/2/2013 11:41 |

81.    In addition to accessing the above information on XTRA's online databases, Pearson also copied and downloaded that day, onto his HP Device, numerous files, folders and/or information of XTRA between approximately 6:35 a.m. and 4:18 p.m.  The information he downloaded and copied contained highly confidential, competitively-valuable and trade secret information which, to XTRA's knowledge, Pearson had no legitimate reason to be downloading and copying at that point.   In addition, information Pearson accessed and downloaded was accessed via XTRALink and XTRA's databases and servers located in St. Louis, Missouri.

82.    For example, Pearson accessed, downloaded and copied XTRA's branch historic pickup reports, which contained historic data regarding how many trailers XTRA's customers picked up on a monthly basis throughout the year in a designated branch location; XTRA's expiring lease reports, which contained information regarding when the trailer leases for XTRA's customers would expire (which gives XTRA the opportunity to contact these customers when most appropriate about renewing their lease agreements); XTRA's branch rental lease conversion opportunities, which identify key potential conversion opportunities within designated branches; and XTRA's branch top revenue accounts reports, which contain breakdowns of XTRA's most active customers for a particular location and how many trailers they rented and/or leased.  This information is highly confidential and competitively valuable.

83.    Moreover, Pearson accessed and downloaded information about locations other than the Allentown Branch, including for Detroit, Michigan and Pittsburgh, Pennsylvania.  A

partial listing of the files Pearson accessed on his XTRA company laptop and/or XTRA's online

database(s) and downloaded on Tuesday, July 2, 2013, onto his HP Device, is provided below:

| File Name | Link File Full Path<br>Target File Base Path | Target File Created Date |
|---|---|---|
| Branch Historic Pickups.LNK | A03\C\Users\jjpearso\AppData\Roaming\Microsoft\Office\Recent\ Branch Historic Pickups.LNK<br>**E:\Branch Historic Pickups** | 7/2/2013 6:35 |
| Branch Expiring Leases - 90 Days.LNK | A03\C\Users\jjpearso\AppData\Roaming\Microsoft\Office\Recent\ Branch Expiring Leases - 90 Days.LNK<br>**E:\Branch Expiring Leases - 90 Days** | 7/2/2013 6:36 |
| Branch Rental Lease Conversion Opportunity.LNK | A03\C\Users\jjpearso\AppData\Roaming\Microsoft\Office\Recent\ Branch Rental Lease Conversion Opportunity.LNK<br>**E:\Branch Rental Lease Conversion Opportunity** | 7/2/2013 6:42 |
| Top Accounts by Branch.lnk | A03\C\Users\jjpearso\AppData\Roaming\Microsoft\Windows\Rec ent\Top Accounts by Branch.lnk<br>**E:\Top Accounts by Branch** | 7/2/2013 6:42 |
| Branch Top Revenue Accounts.LNK | A03\C\Users\jjpearso\AppData\Roaming\Microsoft\Office\Recent\ Branch Top Revenue Accounts.LNK<br>**E:\Branch Top Revenue Accounts** | 7/2/2013 6:43 |
| Branch Historic Pickups - Detroit.LNK | A03\C\Users\jjpearso\AppData\Roaming\Microsoft\Office\Recent\ Branch Historic Pickups - Detroit.LNK<br>**E:\Branch Historic Pickups\Branch Historic Pickups - Detroit.xls** | 7/2/2013 11:32 |
| Branch Rental Lease Conversion Opportunity - Detroit.LNK | A03\C\Users\jjpearso\AppData\Roaming\Microsoft\Office\Recent\ Branch Rental Lease Conversion Opportunity - Detroit.LNK<br>**E:\Branch Rental Lease Conversion Opportunity\Branch Rental Lease Conversion Opportunity - Detroit.xls** | 7/2/2013 11:33 |
| Branch Historic Pickups - Pittsburgh.LNK | A03\C\Users\jjpearso\AppData\Roaming\Microsoft\Office\Recent\ Branch Historic Pickups - Pittsburgh.LNK<br>**E:\Branch Historic Pickups\Branch Historic Pickups - Pittsburgh.xls** | 7/2/2013 11:38 |
| Branch Expiring Leases - Pittsburgh.LNK | A03\C\Users\jjpearso\AppData\Roaming\Microsoft\Office\Recent\ Branch Expiring Leases - Pittsburgh.LNK<br>**E:\Branch Expiring Leases - 90 Days\Branch Expiring Leases - Pittsburgh.xls** | 7/2/2013 11:39 |

4145150

84.     On Wednesday morning, July 3, 2013, between approximately 9:21 a.m. and 10:46 a.m., Pearson accessed additional confidential, competitively valuable information via XTRALink and XTRA's databases and servers, which are located and maintained in St. Louis, Missouri.  To XTRA's knowledge, Pearson had no legitimate reason to be accessing and viewing this information at that point.    Pearson's accessing of this information is highly suspicious, especially since he resigned that same morning.

85.     For example, Pearson accessed confidential and competitively-valuable items on XTRA's online databases pertaining to at least eight other branch locations for which he had no responsibility, including those located in Chicago, Illinois (O'Hare, Midway and Joliet branches); Houston and Dallas, Texas; Indianapolis, Indiana; Louisville, Kentucky; and Memphis, Tennessee.  In addition, Pearson accessed an extremely confidential, detailed and competitively-valuable compilation of information pertaining to one of XTRA's largest customers, Frito Lay, including such information pertaining to XTRA's rental agreements, rates, trailer numbers, key locations, and related information pertaining to XTRA's dealings with Frito Lay.  A partial listing of the information Pearson accessed on his XTRA company laptop on XTRA's online database on Wednesday morning, July 3, 2013 is provided below:

| URL Name | Visit Count | Last Accessed |
|---|---|---|
| http://xtralink.xtra.com/BICenter/Dashboards/Customer Account/Customer Account.aspx | 1 | 7/3/2013 9:21 |
| http://xtralink.xtra.com/BICenter/Dashboards/Multiple Account/Multiple Account.aspx?parentmember=[Customer].[EIS Parent Company ID].%26%5B510024]&parentdisplay=510024 | 1 | 7/3/2013 9:21 |
| http://xlreporting/ReportServer/Pages/ReportViewer.aspx?/Dashboards/Parent Customer RA List&rs:Command=Render&rc:Parameters=false&ParentID=510024 | 1 | 7/3/2013 9:22 |
| E:/Branch Rental Lease Conversion Opportunity/Branch Rental Lease Conversion Opportunity - Dallas.xls | 1 | 7/3/2013 9:57 |
| E:/Branch Top Revenue Accounts/Branch Top Revenue Customers - Dallas.xls | 1 | 7/3/2013 9:57 |
| E:/Branch Historic Pickups/Branch Historic Pickups - Dallas.xls | 1 | 7/3/2013 |

4145150

| | | |
|---|---|---|
| | | 10:04 |
| E:/Branch Expiring Leases - 90 Days/Branch Expiring Leases - Dallas.xls | 1 | 7/3/2013 10:05 |
| E:/Branch Historic Pickups/Branch Historic Pickups - Houston.xls | 1 | 7/3/2013 10:06 |
| E:/Branch Expiring Leases - 90 Days/Branch Expiring Leases - Houston.xls | 1 | 7/3/2013 10:07 |
| http://xtralink.xtra.com/BICenter/Dashboards/Branch/Branch Summary.aspx | 2 | 7/3/2013 10:07 |
| E:/Branch Rental Lease Conversion Opportunity/Branch Rental Lease Conversion Opportunity - Houston.xls | 1 | 7/3/2013 10:08 |
| E:/Branch Top Revenue Accounts/Branch Top Revenue Customers - Houston.xls | 1 | 7/3/2013 10:09 |
| E:/Branch Rental Lease Conversion Opportunity/Branch Rental Lease Conversion Opportunity - Indianapolis.xls | 1 | 7/3/2013 10:23 |
| E:/Branch Top Revenue Accounts/Branch Top Revenue Customers - Indianapolis.xls | 1 | 7/3/2013 10:24 |
| E:/Branch Historic Pickups/Branch Historic Pickups - Indianpolis.xls | 1 | 7/3/2013 10:25 |
| E:/Branch Expiring Leases - 90 Days/Branch Expiring Leases - Indianapolis.xls | 1 | 7/3/2013 10:26 |
| E:/Branch Historic Pickups/Branch Historic Pickups - Chicago Joliet.xls | 1 | 7/3/2013 10:27 |
| E:/Branch Rental Lease Conversion Opportunity/Branch Rental Lease Conversion Opportunity - Chicago-Joliet.xls | 1 | 7/3/2013 10:31 |
| E:/Branch Top Revenue Accounts/Branch Top Revenue Customers - Chicago-Joliet.xls | 1 | 7/3/2013 10:31 |
| E:/Branch Rental Lease Conversion Opportunity/Branch Rental Lease Conversion Opportunity - Chicago-Midway.xls | 1 | 7/3/2013 10:32 |
| E:/Branch Top Revenue Accounts/Branch Top Revenue Customers - Chicago Midway.xls | 1 | 7/3/2013 10:33 |
| E:/Branch Historic Pickups/Branch Historic Pickups - Chicago Midway.xls | 1 | 7/3/2013 10:34 |
| E:/Branch Expiring Leases - Chicago Midway.xls | 1 | 7/3/2013 10:35 |
| E:/Branch Historic Pickups/Branch Historic Pickups - Chicago Ohare.xls | 1 | 7/3/2013 10:35 |
| E:/Branch Expiring Leases - 90 Days/Branch Expiring Leases - Chicago Ohare.xls | 1 | 7/3/2013 10:36 |
| http://xtralink.xtra.com/BICenter/Dashboards/Branch/Branch Summary.aspx | 4 | 7/3/2013 10:36 |
| E:/Branch Rental Lease Conversion Opportunity/Branch Rental Lease Conversion Opportunity - Chicago Ohare.xls | 1 | 7/3/2013 10:37 |
| E:/Branch Top Revenue Accounts/Branch Top Revenue Customers - Chicago Ohare.xls | 1 | 7/3/2013 10:37 |

4145150

| | | |
|---|---|---|
| E:/Branch Rental Lease Conversion Opportunity/Branch Rental Lease Conversion Opportunity - Louisville.xls | 1 | 7/3/2013 10:40 |
| E:/Branch Top Revenue Accounts/Branch Top Revenue Customers - Louisville.xls | 1 | 7/3/2013 10:40 |
| http://xtralink.xtra.com/BICenter/Dashboards/Branch/Sales Action Items.aspx | 4 | 7/3/2013 10:41 |
| E:/Branch Historic Pickups/Branch Historic Pickups - Louisville.xls | 1 | 7/3/2013 10:42 |
| E:/Branch Expiring Leases - 90 Days/Branch Expiring Leases -Louisville.xls | 1 | 7/3/2013 10:43 |
| E:/Branch Historic Pickups/Branch Historic Pickups - Memphis.xls | 1 | 7/3/2013 10:44 |
| E:/Branch Expiring Leases - 90 Days/Branch Expiring Leases - Memphis.xls | 1 | 7/3/2013 10:44 |
| http://xtralink.xtra.com/BICenter/Dashboards/Branch/Branch Summary.aspx | 5 | 7/3/2013 10:45 |
| E:/Branch Rental Lease Conversion Opportunity/Branch Rental Lease Conversion Opportunity - Memphis.xls | 1 | 7/3/2013 10:45 |
| E:/Branch Top Revenue Accounts/Branch Top Revenue Customers - Memphis.xls | 1 | 7/3/2013 10:46 |

86. In addition to accessing the above information on Wednesday morning, July 3, 2013, Pearson also downloaded and copied that day, between approximately 10:37 a.m. and 10:46 a.m., onto his HP Device, highly confidential, competitively-valuable and trade secret information pertaining to XTRA's business. To XTRA's knowledge, Pearson had no legitimate reason to be downloading and copying such information at that point. For example, the forensic information from Pearson's company laptop indicates that Pearson copied onto his HP Device XTRA's branch historic pickup reports, expiring lease reports, branch rental lease conversion opportunities, and branch top revenue customer reports. The information he copied onto his HP Device was accessed and downloaded via XTRALink and XTRA's databases and servers located in St. Louis, Missouri.

87. Moreover, Pearson was accessing, downloading and copying information regarding locations other than the Allentown Branch, including Chicago, Louisville and

4145150

Memphis.  A partial listing of the files Pearson accessed on his XTRA company laptop from

XTRA's online database and downloaded onto the HP Device on Wednesday morning, July 3,

2013, is provided below:

| File Name | Link File Full Path<br>Target File Base Path | Target File Created Date |
|---|---|---|
| Branch Rental Lease Conversion Opportunity - Chicago Ohare.LNK | A03\C\Users\jjpearso\AppData\Roaming\Microsoft\Office\Recent\ Branch Rental Lease Conversion Opportunity - Chicago Ohare.LNK<br>**E:\Branch Rental Lease Conversion Opportunity\Branch Rental Lease Conversion Opportunity - Chicago Ohare.xls** | 7/3/2013 10:37 |
| Branch Top Revenue Customers - Chicago Ohare.LNK | A03\C\Users\jjpearso\AppData\Roaming\Microsoft\Office\Recent\ Branch Top Revenue Customers - Chicago Ohare.LNK<br>**E:\Branch Top Revenue Accounts\Branch Top Revenue Customers - Chicago Ohare.xls** | 7/3/2013 10:37 |
| Branch Rental Lease Conversion Opportunity - Louisville.LNK | A03\C\Users\jjpearso\AppData\Roaming\Microsoft\Office\Recent\ Branch Rental Lease Conversion Opportunity - Louisville.LNK<br>**E:\Branch Rental Lease Conversion Opportunity\Branch Rental Lease Conversion Opportunity - Louisville.xls** | 7/3/2013 10:40 |
| Branch Top Revenue Customers - Louisville.LNK | A03\C\Users\jjpearso\AppData\Roaming\Microsoft\Office\Recent\ Branch Top Revenue Customers - Louisville.LNK<br>**E:\Branch Top Revenue Accounts\Branch Top Revenue Customers - Louisville.xls** | 7/3/2013 10:40 |
| Branch Historic Pickups - Louisville.LNK | A03\C\Users\jjpearso\AppData\Roaming\Microsoft\Office\Recent\ Branch Historic Pickups - Louisville.LNK<br>**E:\Branch Historic Pickups\Branch Historic Pickups - Louisville.xls** | 7/3/2013 10:42 |
| Branch Expiring Leases - Louisville.LNK | A03\C\Users\jjpearso\AppData\Roaming\Microsoft\Office\Recent\ Branch Expiring Leases -Louisville.LNK<br>**E:\Branch Expiring Leases - 90 Days\Branch Expiring Leases - Louisville.xls** | 7/3/2013 10:43 |
| Branch Historic Pickups - Memphis.LNK | A03\C\Users\jjpearso\AppData\Roaming\Microsoft\Office\Recent\ Branch Historic Pickups - Memphis.LNK<br>**E:\Branch Historic Pickups\Branch Historic Pickups - Memphis.xls** | 7/3/2013 10:44 |
| Branch Expiring Leases - Memphis.LNK | A03\C\Users\jjpearso\AppData\Roaming\Microsoft\Office\Recent\ Branch Expiring Leases - Memphis.LNK<br>**E:\Branch Expiring Leases - 90 Days\Branch Expiring Leases - Memphis.xls** | 7/3/2013 10:44 |

4145150

| | | |
|---|---|---|
| Branch Rental Lease Conversion Opportunity - Memphis.LNK | A03\C\Users\jjpearso\AppData\Roaming\Microsoft\Office\Recent\ Branch Rental Lease Conversion Opportunity - Memphis.LNK **E:\Branch Rental Lease Conversion Opportunity\Branch Rental Lease Conversion Opportunity - Memphis.xls** | 7/3/2013 10:45 |
| Branch Top Revenue Customers - Memphis.LNK | A03\C\Users\jjpearso\AppData\Roaming\Microsoft\Office\Recent\ Branch Top Revenue Customers - Memphis.LNK **E:\Branch Top Revenue Accounts\Branch Top Revenue Customers - Memphis.xls** | 7/3/2013 10:46 |

88.     On Wednesday morning, July 3, 2013, at approximately 11:13 a.m., Pearson sent his resignation letter to Chad Wheeler, XTRA's Area Manager for the Eastern United States. In his resignation letter, Pearson stated, "[i]n the interest of full disclosure, I should let you know that I have accepted another position at Premier Trailer Leasing." Pearson, however, did not tell XTRA about the confidential information he had sent to his personal e-mail address, or the information he had been downloading and copying onto his HP Device.

89.     Upon information and belief, Pearson deleted information from his XTRA company laptop in order to hide his misconduct, including his e-mail "Inbox" and "Sent Items" from his work e-mail account.

90.     Pearson indicated to XTRA that he is going to be responsible for overseeing at least several branch offices for Premier.

91.     Pearson's last day of employment at XTRA was July 3, 2013. Following receipt of his resignation notice, XTRA terminated Pearson's access rights to XTRALink, XTRA's servers and databases and his company e-mail.

92.     Upon termination of Pearson's employment, Pearson was supposed to return all of XTRA's property, including records, files, computer disks and other materials, or copies thereof, containing any confidential information. Pearson returned his company laptop, but he did not return the HP Device.

4145150

93.     According to the Relocation Agreement, Pearson is also required to pay 50% of his relocation costs incurred by XTRA.  Pearson owes XTRA approximately $37,000.

94.     XTRA has asked Pearson to pay XTRA what he owes, but he has failed to do so.

95.     Pearson's conduct prior to his resignation strongly indicates that Pearson has improperly accessed, downloaded, copied and taken XTRA's confidential, competitively-valuable and trade secret information in order to help him and Premier unfairly compete against XTRA.

96.     The information Pearson has misappropriated from XTRA could provide Pearson and a competitor such as Premier with an unfair competitive advantage against XTRA.  The confidential, competitively-valuable information misappropriated by Pearson could be used by Pearson and Premier as a blueprint for helping Premier to decide, inter alia, where to open offices, what the expenses should be, where the customer opportunities exist, what rental and lease rates to charge, what types of equipment to place into a particular market place, which customers present the most valuable and/or profitable opportunities, and which other XTRA employees Premier should target.

### COUNT I
### Misappropriation of Trade Secrets Under the MUTSA

97.     XTRA realleges and incorporates herein by reference as if fully set forth herein the allegations of Paragraphs 1-96 above.

98.     Pearson's conduct described above constitutes a misappropriation of trade secrets under the MUTSA.

99.     The information of XTRA that Pearson improperly e-mailed to his personal e-mail address and/or downloaded, copied and took included confidential information and compilations reflecting and/or pertaining to, inter alia, XTRA's top customers, lease conversion

31

opportunities, lease terms (including lease expiration dates), branch-specific revenues, expenses and profitability, utilization reports, sales scorecard data, and personnel performance. The information improperly downloaded, copied and taken derives economic value, actual and potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure and use. Such information is the subject of efforts by XTRA that are reasonable under the circumstances to maintain its secrecy.

100.    Pearson used improper means to improperly acquire and take XTRA's trade secret information. In short, Pearson e-mailed to his personal e-mail address, and downloaded, copied and took, such information when, on information and belief, he was planning to join a direct competitor and, on information and belief, to help him and the competitor. Pearson's surreptitious conduct breached Pearson's duty to maintain the secrecy of XTRA's trade secret information, violated Section 569.095 of the Missouri Revised Statutes, violates the Computer Fraud and Abuse Act, and, more generally, constitutes espionage through electronic or other means as set forth in Mo. Rev. Stat. § 417.453(1).

101.    Pearson's misappropriation of XTRA's trade secret information has damaged and harmed, and is continuing to damage and harm, XTRA. In addition, Pearson is being unjustly enriched as the result of his misappropriation of XTRA's trade secret information.

102.    XTRA cannot be fully or adequately compensated through monetary damages for the irreparable harm and damage caused by Pearson's misappropriation of XTRA's trade secret information.

103.     Pearson's misappropriation of XTRA's trade secret information is likely to continue unless he is temporarily, preliminarily and permanently enjoined from keeping such information.

104.     Pearson's misappropriation of XTRA's trade secret information is outrageous because of Pearson's evil motive and/or reckless disregard of XTRA's rights.

WHEREFORE, XTRA prays that judgment be entered in its favor and against Pearson on Count I of the Complaint, and that:

> (a)     Pearson be temporarily, preliminarily and permanently enjoined from keeping, using or disclosing XTRA's trade secret information;

> (b)     Pearson be ordered to return all of XTRA's trade secret information in his possession or under his custody or control, regardless of the medium in which such information may be stored or preserved;

> (c)     XTRA be awarded compensatory and other damages recoverable under Mo. Rev. Stat. § 417.457, based upon the evidence to be presented at trial;

> (d)     XTRA be awarded punitive damages in accordance with the MUTSA;

> (e)     XTRA be awarded its costs and expenses; and

> (f)     XTRA be awarded such other and further relief as the Court deems appropriate and just.

### COUNT II
### Misappropriation of Trade Secrets Under the PUTSA

105.     XTRA realleges and incorporates herein by reference as if fully set forth herein the allegations of Paragraphs 1-96 above.

33

106.    XTRA has alleged that Pearson's conduct violates the MUTSA.   If, however, Pennsylvania rather than Missouri law were to apply to Pearson's conduct, then his conduct would violate the PUTSA.

107.    Pearson's conduct described above constitutes a misappropriation of trade secrets under the PUTSA.

108.    The information of XTRA that Pearson improperly e-mailed to his personal e-mail address and/or downloaded, copied and took included confidential information and compilations reflecting and/or pertaining to, inter alia, XTRA's top customers, lease conversion opportunities, lease terms (including lease expiration dates), branch-specific revenues, expenses and profitability, utilization reports, sales scorecard data, and personnel performance.   The information improperly downloaded, copied and taken derives economic value, actual and potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure and use.   Such information is subject of efforts by XTRA that are reasonable under the circumstances to maintain its secrecy.

109.    Pearson used improper means to improperly acquire and take XTRA's trade secret information.   In short, Pearson e-mailed to his personal e-mail address, and downloaded, copied and took such information when, on information and belief, he was planning to join a direct competitor and, on information and belief, did so to help him and the competitor. Pearson's surreptitious conduct, inter alia, breached Pearson's duty to maintain the secrecy of XTRA's trade secret information, and constitutes espionage through electronic or other means as set forth in Pa. Const. Stat. § 5302.

34

110.    Pearson's misappropriation of XTRA's trade secret information has damaged and harmed, and is continuing to damage and harm, XTRA. In addition, Pearson is being unjustly enriched as the result of his misappropriation of XTRA's trade secret information.

111.    XTRA cannot be fully or adequately compensated through monetary damages for the irreparable harm and damage caused by Pearson's misappropriation of XTRA's trade secret information.

112.    Pearson's misappropriation of XTRA's trade secret information is likely to continue unless he is temporarily, preliminarily and permanently enjoined from keeping such information.

113.    Pearson's misappropriation of XTRA's trade secret information was willful and malicious under the PUTSA, including for purposes of PA. CONS. STAT. §§ 5302, 5304 and 5305. Pearson's intentional acts and/or gross neglect of his duty evince a reckless indifference of XTRA's rights by Pearson, and an entire want of care.

114.    Because of Pearson's willful and malicious misappropriation, XTRA is entitled to recover its reasonable attorneys fees, expenses and costs.

WHEREFORE, XTRA prays that judgment be entered in its favor and against Pearson on Count II of the Complaint, in and that:

> (a)    Pearson be temporarily, preliminarily and permanently enjoined from keeping, using or disclosing XTRA's trade secret information;
>
> (b)    Pearson be ordered to return all of XTRA's trade secret information in his possession or under his custody or control, regardless of the medium in which such information may be stored or preserved;

4145150

(c)     XTRA be awarded compensatory and other damages recoverable under 12 PA. CONS. STAT. § 5304, based upon the evidence to be presented at trial;

(d)     XTRA be awarded punitive damages in accordance with the PUTSA;

(e)     XTRA be awarded its costs and expenses, including its reasonable attorneys fees; and

(f)     XTRA be awarded such other and further relief as the Court deems appropriate and just.

## COUNT III
### Missouri Computer Tampering Statutes

115.    XTRA realleges and incorporates herein by reference as if fully set forth herein the allegations of Paragraphs 1-96 above.

116.    Section 537.525 of the Missouri Revised Statutes provides as follows:

> 1. In addition to any other civil remedy available, the owner or lessee of the computer system, computer network, computer program, computer service or data may bring a civil action against any person who violates sections 569.095 to 569.099, RSMo, for compensatory damages, including any expenditures reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, computer service, or data was not altered, damaged or deleted by the access.

> 2. In any action brought pursuant to this section, the court may award reasonable attorney's fees to a prevailing plaintiff.

117.    XTRA is both an owner and lessee under Section 537.525.

118.    Pearson's conduct violates Section 569.095 of the Missouri Revised Statutes. Pearson knowingly and without authorization or without reasonable grounds to believe that he had such authorization, at a minimum:

4145150

(a) took XTRA's data and/or supporting documentation, residing or existing internal or external to XTRA's computer, computer system and/or computer network, and/or

(b) retained data he knew or believes he obtained without authorization and/or without reasonable grounds to believe he had such authorization.

119.   XTRA has been damaged, and is continuing to be damaged, by Pearson's conduct in violation of Section 569.095.

WHEREFORE, XTRA prays that judgment be entered in its favor and against Pearson on Count III of the Complaint, and that:

(a)   Pearson be temporarily, preliminarily and permanently enjoined from retaining, using or disclosing data and/or supporting documentation that he obtained in violation of Section 569.095;

(b) Pearson be ordered to return all data and/or supporting documentation that he obtained in violation of Section 569.095;

(c)   XTRA be awarded compensatory damages recoverable under Section 537.525 of the Missouri Revised Statutes;

(d)   XTRA be awarded its costs, expenses and reasonable attorneys fees;

(e)   XTRA be awarded such other and further relief as the Court deems appropriate and just.

4145150

## COUNT IV
### Violation of the CFAA, 18 U.S.C. § 1030

120.    XTRA realleges and incorporates herein by reference as if fully set forth herein the allegations of Paragraphs 1-96 above.

121.    Pearson's conduct described above violates the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030.    Pearson's conduct, at a minimum, violates 18 U.S.C. § 1030(a)(2)(C).

122.    XTRA's XTRALink, databases and servers, as well as Pearson's XTRA company laptop, are "computers" and "protected computers" under 18 U.S.C. § 1030(e)(1) and (2).

123.    Pearson was not authorized to access XTRA's XTRALink, databases or servers or his XTRA laptop computer in order to review, download or copy XTRA's confidential, proprietary, competitively valuable or trade secret information to help Premier and/or to help him compete after he joined Premier.    Pearson also was not authorized to access XTRA's XTRALink, databases or servers or Pearson's XTRA laptop computer in order to e-mail any such information to his personal e-mail address for such purposes.

124.    Pearson acted without authorization and/or in excess of his authorization in accessing XTRA's XTRALink, databases and servers, and/or Pearson's XTRA laptop computer, in order to review, download or copy and/or e-mail to his personal e-mail address, XTRA's confidential, proprietary, competitively valuable or trade secret information to help Premier and/or to help him compete after he joined Premier.

125.    Pearson's conduct described above has caused XTRA damage and loss.    XTRA's damage and loss include, but are not limited to, (a) expenses, fees and costs incurred to uncover and determine the extent of Pearson's computer-related misconduct; and (b) damages and/or losses in an amount not yet determined resulting from the impairment of the integrity of the data

38

and/or information pertaining to Pearson's computer-related misconduct. Such damages and/or losses are already well in excess of $5,000.

126. XTRA is entitled, among other things, to recover compensatory damages and injunctive relief under 18 U.S.C. § 1030(g) as the result of Pearson's violations of the CFAA.

WHEREFORE, XTRA prays that judgment be entered in its favor and against Pearson on Count IV of the Complaint, and that XTRA be awarded compensatory damages based upon the evidence to be presented at trial, injunctive relief, costs, and such other and further relief as the Court deems appropriate and just.

### COUNT V
### Breach of the Duty of Loyalty

127. XTRA realleges and incorporates herein by reference as if fully set forth herein the allegations of Paragraphs 1-96 above.

128. While he was employed by XTRA, Pearson was an agent of XTRA and owed XTRA a duty of loyalty.

129. Pearson breached his duty of loyalty to XTRA by improperly accessing, viewing, copying and/or downloading XTRA's confidential and/or competitively-valuable information (to the extent such information was not trade secret under the MUTSA and/or the PUTSA) for the purposes of helping him and a competitor like Premier unfairly compete against XTRA.

130. In addition, stockpiling this information for the benefit of a competitor – whether it was to save time, money, or effort for the competitor – was competition (i.e. unfair competition) in and of itself. Pearson, in essence, was working to benefit Premier while he was still employed by XTRA, and his competitive misconduct for Premier's benefit while he was still employed by XTRA breached the duty of loyalty he owed to XTRA.

131.   Pearson's breaches of the duty of loyalty have damaged and harmed, and are continuing to damage and harm, XTRA.

132.   Pearson acted maliciously, recklessly and with reckless indifference of XTRA's rights in breaching his duty of loyalty.

WHEREFORE, XTRA prays that judgment be entered in its favor and against Pearson on Count V of the Complaint, in and that XTRA be awarded compensatory damages based upon the evidence to be presented at trial, punitive damages, costs, and such other and further relief as the Court deems appropriate and just.

## COUNT VI
### Breach of Contract

133.   XTRA realleges and incorporates herein by reference as if fully set forth herein the allegations of Paragraphs 1-96 above.

134.   Pearson has failed to reimburse XTRA for 50% of his moving expenses from his January 2012 transfer at XTRA as required under his Relocation Agreement.

135.   Pearson is in breach of his Relocation Agreement.

136.   Pearson's breach of his Relocation Agreement had damaged and harmed, and is continuing to damage and harm, XTRA.

WHEREFORE, XTRA prays that judgment be entered in its favor and against Pearson on Count VI of the Complaint, in and that XTRA be awarded:

(a)     the full amount it is owed — approximately $37,000 — in compensatory damages, plus interest;

(b)     its costs and expenses; and

(c)     such other and further relief as the Court deems appropriate and just.

40

4145150

BRYAN CAVE LLP


By:  */s/ Mark S. Deiermann*
      Mark S. Deiermann, Mo. Bar #31521
      Laura J. Spencer, Mo. Bar #61645
      Amanda E. Colvin, Mo. Bar #61763
      211 North Broadway
      Suite 3600
      St. Louis, MO  63102-2750
      Tele:  (314) 259-2000
      Fax:  (314) 259-2020

Attorneys for Plaintiff
XTRA Lease LLC

4145150

## DECLARATION

I, Stephen T. Zaborowski, being of lawful age, hereby declare under penalty of perjury, as follows:

1.    I am the Senior Vice President of XTRA Lease LLC.

2.    The facts alleged in the Verified Complaint are based upon matters known personally to me and/or on information provided by others, and are true and correct to the best of my knowledge, information and belief.

_____
Stephen T. Zaborowski

42

4145150



January 23, 2012

Jim Pearson
24 Renee Lane
Newark, DE  19711

Re:  Relocation Agreement


Dear Jim,

This letter is to confirm your relocation to Allentown as Branch Manager. The effective
date of this relocation is January 23, 2012. In this position, you will have full general
management and P & L responsibility for the branch. You will develop your own portfolio
of accounts, assist the branch sales staff in the management, growth and development
of their accounts, and be responsible for the people development aspect of the branch,
i.e., the selection, development, coaching, and occasionally the discipline of your
branch employees. You will report to the combined Region 7/Region 6 staff.

### Compensation and Benefits

*Base Salary* – Your base salary will remain at $3,333.33 semi-monthly, which is
equivalent to $80,000.00 annually.

*Bonus* – You will be eligible for the Allentown Branch Manger bonus effective January
1, 2012.

*Car Allowance* – You will be eligible for a car allowance of $675.00 per month.

*Relocation* - The Company will pay the following expenses to expedite your move to
the Allentown, PA area.

- A professional moving company to relocate your household furnishings. Professional
  moving services will be provided through Graebel Van Lines. Your move will be
  assigned to Graebel Relocations Services Worldwide and a Relocation Consultant
  will be in contact with you soon. Should you have any questions regarding the BVO
  program contact Darla Smithson, HR Assistant. The contact at Graebel is:

  - Jill Luttenin, Graebel Relocation Services Worldwide, (866) 724-4779

I

Exhibit A

*Closing Costs that will be paid:*

Legal Fees
Title Insurance and title fees
Stamps
Inspections and surveys
Loan origination fee or points shall be limited to 1 point

Jim, I trust you will find the information above acceptable. By accepting this offer you are agreeing to help XTRA Lease manage and minimize the costs of your relocation. Furthermore, by executing this agreement, you will agree to reimburse the Company 100 percent of the relocation costs if you leave the Company on your own volition within 365 days after the relocation is complete. If you leave the Company on your own volition within 730 days after the relocation is complete, you agree to reimburse the Company 50 percent of the relocation costs.

Sincerely,

Accepted:

Shawn A. Hughes
Vice President, Human Resources

Jim Pearson

cc:  Chase Whitaker
     Payroll

3